UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| GARY RAY MILLER, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CAUSE NO. 3:11-CV-109-TLS-CAN |
| V. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | | |

**REPORT AND RECOMMENDATION**

On September 2, 2011, Plaintiff, Gary Ray Miller ("Miller"), filed his opening brief requesting remand or reversal of the denial of his benefits. On December 12, 2011, Defendant, Michael J. Astrue, Commissioner of Social Security Administration ("Commissioner"), filed a response. On January 5, 2012, Miller filed his reply brief. This Court now enters the following Report and Recommendation pursuant to the referral order and 28 U.S.C. § 636 (b)(1)(B).

**I.  PROCEDURE**

Miller seeks judicial review of the Social Security Administration's final decision denying his September 19, 2006 application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. § 423(d), and for Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3), alleging a disability onset date of May 15, 2006. (Tr. 17). After a hearing, an ALJ found that Miller was not disabled through the date of his decision. *Id.* The Appeals Council denied Miller's request for review of the decision. (Tr. 1-3), thereby rendering it the Agency's final decision for purposes of judicial review. 20 C.F.R. §

1

404.981. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II.     RELEVANT BACKGROUND

Miller was 49 years old on his alleged disability onset date and 52 years old on the date of the ALJ's decision. (Tr. 26). He had a seventh-grade education and last worked in 2006 as a truck driver. (Tr. 31, 45). Miller stopped working on May 15, 2006, shortly after sustaining a closed head injury.

### A.     Medical Evidence

Miller took pain killers and anti-anxiety medication between September 2005 to October 2006. (Tr. 252-72). In October 2005, he went to the Emergency Room complaining of chronic neck pain after a car accident. An X-ray of his head showed minimal front soft tissue swelling. (Tr. 235). A CT scan of his neck showed severe degenerative disc disease with neural foraminal stenosis[1] at three levels of his cervical spine. (Tr. 234). He was treated with a pain killer and released the next day. (Tr. 228-30).

In February 2006, shortly before the alleged disability onset date, Miller fell and hit his head while intoxicated. (Tr. 241-48). He went to the Emergency Room where he reported that he was unconscious for about two minutes and complained of head and neck pain. (Tr. 241-42). He was treated for a closed head injury and scalp laceration and released with seven staples. (Tr. 241-48). A CT scan of his head showed mild degeneration of brain cells and a left scalp laceration. (Tr. 247). A CT scan of his neck showed severe degenerative disc disease at three levels of his cervical spine with prominent spondylosis, producing foraminal and spinal canal

---

[1]Foraminal stenosis- the narrowing of the upper vertebrae in the back. <u>Dorland's Illustrated Medical Dictionary.</u> 518, 1249 (26th ed.1985).

impingement. (Tr. 247-48). Miller was released and instructed to stop drinking. (Tr. 246).

On May 30, 2006, he visited his primary care physician, Dr. Douglas Strycker, for a finger injury and hypertension. (Tr. 257-58). Miller made no complaints of head pain or memory problems during this visit. (Tr. 252-258). Between May 2006 to October 2006, he sought prescription refills and made no complaints of pain. (Tr. 252-256).

On December 1, 2006, a psychologist examined Miller and administered a memory test. (Tr. 273-279). Miller complained of intermittent head pain and memory problems since he hit his head in February. (Tr. 273). He reported that his medications helped with pain. (Tr. 273). He reported that he did not go out much because of anxiety, and he stated that his mood was anxious and his affect was blunted. (Tr. 274). He indicated that he could cook, clean, and care for his hygiene, and that his sister shopped for groceries and managed his money. (Tr. 274). Miller reported that he has been arrested for intimidation, public intoxication, and other offenses he could not recall. (Tr. 275). He enjoyed going out with women and his family. (Tr. 274).

The psychologist observed that Miller appeared to be anxious and that his immediate and recent memory were poor, but his past memory was fair. (Tr. 274-75). Miller's scores on a memory test were borderline on the visual immediate memory and extremely low on the other sections of the tests. (Tr. 276). The psychologist diagnosed Miller with dementia due to head trauma and an anxiety disorder and assigned him a GAF of 40-45.[2] (Tr. 277).

Three weeks later, a physician examined Miller. (Tr. 280-83). Miller complained of some discomfort and reduced range of motion in his neck and that for the previous six to eight months,

---

[2] GAF scores represent on a single day an individual's overall level of functioning, including symptom severity. The GAF numeric scale runs from 0 through 100. The higher the GAF score, the less severe the symptoms and the individual will have a higher level of functioning.

he had pain in his legs and feet of an unknown cause. (Tr. 280). He reported that he could carry twenty pounds, walk up to three blocks, stand up to thirty minutes at a time, and climb up to three flights of stairs. *Id*. The physician observed that Miller had some limited range of motion primarily in his neck, lower back, and right shoulder. In addition, he could not stand on his toes, his heels, or crouch. But, he was able to get on and off the table without difficulty and had a normal gait and neurological exam. (Tr. 280-283). The physician diagnosed Miller with hypertension, a history of neck problems, post-scalp laceration with memory loss and anxiety, and pain in the lower limbs of unknown cause. (Tr. 282). He did not opine as to whether Miller had any functional work limitations. *Id*.

In January 2007, a state agency reviewing physician examined the evidence in Miller's file and opined that Miller did not have a severe impairment. (Tr. 284). Three months later, another physician affirmed this opinion. (Tr. 304). Additionally, a state agency reviewing psychologist reviewed the evidence in Miller's file and completed a Psychiatric Review Technique Form (PRTF). (Tr. 285-302). The psychologist opined that Miller was moderately limited in his activities of daily living and mildly limited in his social functioning and concentration, persistence, or pace. (Tr. 300). He cited the first psychologist's diagnoses and GAF score; Miller's history of a head laceration; his being diagnosed with anxiety, but not going to any counseling; his lack of memory complaints to his primary care physician; his history of alcohol abuse; and his activities of daily living, including the support he received from his sister. (Tr. 287). The psychologist opined that Miller retained the ability to perform SRT (simple repetitive tasks) on a sustained basis without special consideration. (Tr. 287). Three months later, another psychologist affirmed this opinion.

On February 12, 2007, Miller saw James Hanus, D.O., his primary care physician, for neck, shoulder, hip, and feet pain. (Tr.311). Dr. Hanus continued to prescribe Miller pain killers, anti-anxiety medication, and included a muscle relaxant. (Tr. 311). Two week later, Miller complained of memory problems. (Tr. 311). Dr. Hanus diagnosed Miller with memory loss and suspected Alzheimer's disease. (Tr. 311).

In March 2007, Dr. Hanus reported that a CT scan of Miller's head and laboratory tests were normal and showed no atrophy of the frontal lobes of Miller's brain. (Tr. 307). Dr. Hanus diagnosed Miller with "[d]ementia with normal scan and labs." (Tr. 307). Dr. Hanus prescribed medication to help with the dementia symptoms and recommended Miller do crossword puzzles. (Tr. 307).

In November 2007, Dr. Hanus diagnosed Miller with depression, mild dementia, and chronic pain. Dr. Hanus replaced some of Miller's memory medications, and Miller had a normal neurological exam. (Tr. 315).

In May 2008, Miller underwent a psychological evaluation at Bowen Center to aid in a determination as to his Medicaid eligibility. (Tr. 331-33). He reported that he had a seventh grade education with no special education classes. (Tr. 331). He complained of having neck pain, memory problems, depression, and recent noticeable concentration difficulties. (Tr. 332). A psychologist observed that Miller had a depressed mood, normal recent memory, fair long-term memory, and below average intelligence. (Tr. 332). The psychologist diagnosed Miller with major depressive disorder, and a pain disorder. (Tr. 333). The psychologist also opined that Miller showed evidence of Alzheimer's dementia. *Id.*

In September and December of 2008, Miller visited Dr. Hanus with complaints of a knee

5

rash and increased anxiety. (Tr. 313-314). Dr. Hanus prescribed anti-anxiety medication, replaced Miller's pain killers, and continued Miller on a muscle relaxant. No mention was made of dementia. (Tr. 313-314).

In January 2009, Miller underwent intelligence and memory testing and a clinical interview with another psychologist on a referral from his attorney. (Tr. 318-22). Miller scored in the extremely low range on all but one memory test and in the mildly mental retarded range on intelligence tests. (Tr. 321-22). Miller reported that he hit his head in 2005 and had been unconscious for eight hours; left his job as a trucker because his boss thought he could not drive safely; that his sister provided him with twenty-four-hour live-in-care; and that he needed constant reminders to do things, including eating. (Tr. 318-20).The psychologist opined that Miller was clearly experiencing a progressive loss of mental functioning, probably due to dementia, and possibly beginning at the time of the head injury. She opined that Miller's memory problems indicated possible beginning of dementia of an Alzheimer's type. (Tr. 322). She also observed that Miller had balance and gait problems that showed signs of Parkinson's disease. She diagnosed Miller with dementia due to head trauma and mild mental retardation; assigned him a GAF score of 45; and opined that based on her testing, he was disabled and unlikely to ever be able to return to work. (Tr. 322).

In April 2009, Dr. Hanus reported that Miller scored a twenty-nine out of thirty on a "mini" mental health exam. (Tr. 329). Dr. Hanus opined that Miller had no more than mild dementia and that it was probably not Alzheimer's dementia. *Id*. Dr. Hanus also reported that Miller recently lost all of his medications except the one that had no resale value. *Id*. Dr. Hanus indicated that Miller showed no signs of dementia when he attempted to explain why he was not

trying to "con" Dr. Hanus regarding the loss of medication. *Id*.

### B. Vocational Background, Miller's Testimony, Miller's Friend's Testimony

Miller was 49 years old on his alleged disability onset date and 52 years old on the date of the ALJ's decision. (Tr. 26). He had a seventh-grade education and last worked in 2006 as a truck driver. (Tr. 31, 45). He testified that he did not know why his job ended but it had nothing to do with drinking. (Tr. 33, 35-36).

Miller testified that he had constant throbbing leg pain which was aggravated by sitting and walking. (Tr. 33-35). He indicated that he could not turn his neck. (Tr. 34). Additionally, Miller testified that he had memory problems since hitting his head in 2006. He testified that he had been diagnosed with Alzheimer's disease and needed to write things down. (Tr. 40). Furthermore, he indicated that he had balance problems. (Tr. 41). He stated that he took pain killers, muscle relaxants, and medication to treat his dementia. He testified that these medications helped, but occasionally caused constipation. (Tr. 35). Miller also testified that he could carry twenty pounds, walk a quarter of a mile, stand for ten to fifteen minutes, and sit for about one hour at a time. (Tr. 36-37). He indicated that he did not cook, clean, drive, or perform activities. (Tr. 37-38).

Miller's friend also testified at the hearing. (Tr. 43-44). She stated that she spent two to five hours daily with Miller, during which time she cooked, shopped, cleaned, and drove him places. (Tr. 43). She also testified that she needed to remind him to shower and shave. *Id*.

### C. Vocational Expert Testimony

The ALJ asked the VE what sedentary work was available for someone with Miller's education background with a limitation or limitations that were inaudible. (Tr. 45). However, in

his decision, the ALJ noted that he asked the VE what jobs were available in the national economy for someone of Miller's background and residual functional capacity, which limited Miller to simple repetitive tasks. (Tr. 22, 26-27). The VE testified that such a person could perform the representative, unskilled medium jobs of janitorial labor (120,000 jobs); dishwasher (50,000 jobs); and packager (50,000 jobs). (Tr. 45-47).

## III. ANALYSIS

### A. Standard of Review

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual finding must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. See *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard.

*See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind the decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)(quoting *Scott*, 297 F.3d at 595).

**B.  Plaintiff's Motion**

To be eligible for disability benefits, a Plaintiff must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C.§§ 423(d)(1)(A), 1382(c)(a)(3)(A). To be found disabled, the Plaintiff's impairment must not only prevent him from doing her previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C.§§ 423(d)(2)(A),

9

1382c(a)(3)(B); 20 C.F.R. Sec(s) 404.1520(e)-(f), 416.920(e)-(f).

Social Security regulations provide a five-step inquiry to evaluate whether Miller is entitled to benefits. 20 CFR §§ 404.1520(a)(4), 416.920(a)(4). The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the impairment meets or equals an impairment listed in the regulations; (4) the claimant's RFC leaves her able to do past relevant work; and (5) the claimant is unable to perform other work that exists in significant numbers in the national economy. 20 C.F.R.§§ 404.1520(a)(4)(I)-(v), 416.920(a)(4)(I)-(v); *See also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

Miller argues that the ALJ erred for several reasons. First, Miller argues the ALJ failed to make a proper Step Three finding concerning Miller's mental impairments. Second, Miller argues the ALJ erred when he failed to properly weigh the treating physician's diagnosis that Miller was disabled due to dementia. Third, Miller argues the ALJ erred when he failed to call another medical expert to provide additional medical opinions concerning Miller's mental disabilities. Finally, Miller argues the ALJ failed to give the Vocational Expert a proper hypothetical that accounted for Miller's concentration difficulties and his leg and neck pain.

**1. The ALJ made a proper Step Three finding.**

As stated before, the ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind the decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant

meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)(quoting *Scott*, 297 F.3d at 595).

The ALJ supported his decision with substantial evidence that Miller did not have an impairment or combination of impairments that met or medically equaled the requirements for Listings 12.02 (Organic mental disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain) or 12.05 (disorders related to mental retardation). See 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.02; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; Listing 12.05(C).

The ALJ relied on diagnoses of Miller's own treating physician, Dr. Hanus, who, in April 2009, stated that Miller suffered no more than mild dementia and indicated that Miller showed no signs of dementia when explaining his lost medication. Furthermore, the ALJ found that Miller's daily activities showed no more than mild mental limitations, and certainly none that rose to the level of the requirements for Listings 12.02 and 12.05. Finally, the ALJ also noted that Miller had never been hospitalized for psychiatric reasons. As a result, the ALJ's opinion is sufficiently supported by evidence in the record.

### 2. The ALJ did not err when he did not give Dr. Monroe's opinion significant weight.

Miller argues the ALJ erred when he failed to give Dr. Monroe's opinion significant weight. However, an ALJ may reasonably discount a physician's opinion if it appears to be based on a claimant's exaggerated subjective allegations. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001)**.** Furthermore, an ALJ may discount a treating sources opinion if it is inconsistent with the record. *Id.*.

The ALJ noted that Miller made "numerous statements that are not consistent with the objective medical evidence or his later testimony at the hearing."(Tr. 25). Miller's statements to

Dr. Monroe regarding his need for live-in care, the reason he was fired from his job, and how long he was passed out in the emergency room from a head injury, were exaggerated and inconsistent with the record. *Id*. Furthermore, the ALJ noted that Miller's treating source, Dr. Hanus, opined Miller's memory loss was not extreme and probably not Alzheimer's dementia. Finally, the ALJ notes Dr. Hanus's neurological 2006 and 2008 neurological examinations were normal. In addition to Miller's exaggerations, Dr. Hanus's neurological evaluations demonstrate Dr. Monroe's medical opinions are inconsistent with the record.

Miller argues that the ALJ played doctor when he discounted Dr. Monroe's opinion due to Miller's credibility. However, this is not the case. The ALJ simply noted that other substantial evidence in the record, namely Dr. Hanus's opinion, was inconsistent with Dr. Monroe's opinion concerning Miller's mental abilities. Therefore, the ALJ discounted Dr. Monroe's opinion for a proper reason.

### 3. The ALJ did not err when he failed to seek additional medical testimony.

Miller argues that the ALJ erred in not calling a medical expert to clarify whether Miller did in fact suffer from mental impairments that would label him severely impaired under a Step Three analysis. Furthermore, Miller argues the ALJ erred when he failed to call a medical expert to testify before reaching his RFC opinion limiting Miller to simple and repetitive tasks. An ALJ's decision to ask for and consider an additional medical expert is discretionary. *Clifford v. Apfel*, 227 F.3d 863, 873 (7th Cir. 2000)**.** Furthermore, an ALJ is not required to consult a medical expert where the record is adequate to render a decision. *Skarbeck v. Barnhardt*, 390 F.3d 500, 504 (7th Cir. 2004); 20 C.F.R. § 404.1527(f)(2)(iii).

The ALJ reviewed the decisions of four state agency physicians to conclude that Miller's

impairments did not meet or medically equal a listing. Furthermore, "[s]tate agency medical and psychological consultants are highly qualified physicians and the psychologists who are experts in the evaluation of the medical issues in disability claims," and "[f]indings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion." SSR 96-6p. The ALJ relied on a state agency physician's opinion and adopted it as his RFC finding. (Tr. 22-25, 287). Therefore, the ALJ based his decision on substantial evidence when he considered the numerous opinions by medical experts in formulating Miller's RFC finding.

### 4. The Court cannot determine whether the ALJ posed a proper hypothetical.

An ALJ is required to orient the VE to the totality of a claimant's limitations. *O'Conner-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Additionally, as stated before, an ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)(quoting *Scott*, 297 F.3d at 595).

Transcripts of the ALJ's examination of the VE provide no evidence of whether the ALJ properly included Miller's mental limitations in his hypothetical to the VE. *See* Tr.45-47. The transcripts indicate that the ALJ's question at that point was inaudible. The Court recognizes that the ALJ may have properly posed a hypothetical to Miller, but the record does not so indicate.

The Court must have a complete record in order to assess whether the ALJ's analysis in this regard was proper.

## IV. CONCLUSION

Because the record does not show whether the ALJ posed a proper hypothetical to the VE, the record must be supplemented before the Court can assess the adequacy of the ALJ's opinion in that regard. Accordingly, this Court **RECOMMENDS** that the ALJ's decision be **REMANDED**.

> **NOTICE IS HEREBY GIVEN that within ten (10) days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.**

**SO ORDERED**

Dated this th Day 16th of April , 2012

 S/Christopher A. Nuechterlein
Christopher A. Nuechterlein
United States Magistrate Judge